IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| TIMOTHY L. BERTSCHY, Receiver, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 12-2078 |
| ) | |
| COMPREHENSIVE CAPITAL ) | |
| MANAGEMENT, INC. and ) | |
| COMPREHENSIVE ASSET ) | |
| MANAGEMENT AND SERVICING, INC., ) | |
| ) | |
| Defendants, ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES Receiver Timothy L. Bertschy ("Receiver"), by his undersigned attorneys, and files this Complaint (and Demand for Jury Trial) against Comprehensive Capital Management, Inc. and Comprehensive Asset Management and Servicing, Inc., (collectively, "Comprehensive" or the "Defendants") stating as follows:

**INTRODUCTION**

1. The Receiver was appointed as Receiver of the Estate of Timothy J. Roth ("Roth"), KeyOp Exercise, Inc. ("KeyOp"), Mezolink, Inc. ("Mezolink"), VCN Celect.org, LLC ("Celect"), and VComm Networks of Canada ("VComm") by order of this Court on March 31, 2011 (the "Order") in *United States Securities and Exchange Commission, Plaintiff v. Timothy J. Roth, Defendant, et al.*, USDC (CD-IL), Case No. 11-cv-2079. (the "SEC Suit"). A copy of the Order Appointing Receiver is attached as Exhibit A.

1

2. The Order grants and assigns to the Receiver, *inter alia*, the following powers and duties:

    a. To bring such legal actions based on law or equity in any state, federal, or foreign court as he deems necessary or appropriate in discharging his duties as Receiver;

    b. To pursue, resist and defend all suits, actions, claims and demands that may now be pending or that may be brought by or asserted against the Receiver Estate; and

    c. To take any action that could be taken by the officers, directors, partners, members, shareholders, and trustees of Defendant or Relief Defendants.

(Order, Ex. A at p. 3).

3. In its order of June 2, 2011 (Doc. #45), this Court granted the Receiver's Motion for Leave to File Suit (Doc. #41). In that order, this Court authorized the Receiver to pursue claims against third parties on behalf of the companies and individual investors directly injured by Roth's actions and the failures of those associated with Roth. (Doc. #45, pp. 5-6).

4. Acting pursuant to those powers and duties described above, the Receiver files this action to recover losses suffered by the Receiver Estates (as defined in the Order), including those losses which may be based upon claims of companies and individual investors who were injured by Roth's actions and by the acts, errors and omissions of those associated with Roth.

**JURISDICTION AND VENUE**

5. This action is filed in the Federal Court which established the Receivership. The action seeks to accomplish the ends for which the Receivership was established. Accordingly, the action is properly filed in this Court. *See Pope v. Louisville, N.A. & C. By. Co.*, 173 U.S. 573, 577, 19 S.Ct. 500, 43 L.Ed. 814 (1899); *Tcherepnin v. Franz*, 485 F.2d. 1251, 1255-56 (7th Cir. 1973); *Cagan v. Intervest Midwest Real Estate Corp.*, 774 F.Supp. 1089, 1093 (N.D. Ill. 1991).

**BACKGROUND FACTS**

6. Roth, a Champaign-Urbana, Illinois based investment adviser, misappropriated over $16 million worth of client funds from individuals and certain non-qualified option compensation plans ("Plans") for which he (and thus Comprehensive) provided investment advice.

7. From approximately 2002 until February 2011, Roth was an associated person to Defendant Comprehensive Capital Management, Inc. and a registered representative for Defendant Comprehensive Asset Management and Servicing, Inc.

8. At relevant times, Roth also served Mezolink, Celect, and VComm in various capacities. Roth controlled these companies at all relevant times.

9. Roth also owned KeyOp until 2003, at which time he transferred record ownership to a third party. Regardless of this transfer, Roth controlled KeyOp at all

relevant times. Roth maintained an account at TD Ameritrade (TD Waterhouse) ("TD") in KeyOp's name.

10. As part of his work with Comprehensive, Roth (and thus Comprehensive) provided investment management services to Plans and individuals and served as the investment adviser to those Plans and individuals.

11. The Plans were offered by several employers as a part of a special compensation program for certain of their employees. Under the Plans, the special compensation was paid out to the employees through liquidation of mutual funds which had been or were purchased with company funds. The mutual funds were maintained in a Plan's account at TD.

12. The liquidation of mutual funds process was supposed to work as follows: When Roth was advised that an employee (i.e., a "participant" in a Plan) wanted to take his/her compensation, Roth then calculated the amount of mutual funds necessary for the Plan to sell to generate the required amount of compensation. Roth obtained a letter of authorization from the employer, or in some cases a Plan trustee, allowing the required number of mutual fund shares to be transferred from the Plan's account at TD to KeyOp's account at TD. Upon receipt from Roth of the completed or signed authorization letter, TD transferred the requested mutual fund shares to the KeyOp account at TD. Roth then sold the shares while they were in the KeyOp account. Net

monies from the sale, after appropriate withholding, should have been sent from KeyOp to the employee.

13. Roth's use of KeyOp to receive Plan funds was improper and violated industry standards, Comprehensive's internal policy, and legal requirements. As stated above, Roth controlled KeyOp at all relevant times. Ownership and/or control by Roth over KeyOp put Roth, and therefore Comprehensive, in custody of client funds when Roth transferred client mutual fund shares to the KeyOp account and held those shares in the KeyOp account. This process created a significant opportunity for misappropriation by Roth. Comprehensive should have required several protective steps to be taken. This was also in direct violation of Comprehensive's internal policy forbidding itself or employees from accepting or maintaining custody of client assets.

14. Comprehensive knew or should have known of Roth's use of KeyOp as described herein. In or about 2003, Comprehensive became aware that Roth owned KeyOP. Comprehensive's compliance officer told Roth that under applicable law the KeyOp account could not be in Roth's name. However, in further discussions, the compliance officer told Roth that he could put KeyOp and the KeyOp account in the name of a figurehead. Roth made it clear to the compliance officer that he (Roth) would continue to control the KeyOp account. On information and belief, the KeyOp account was never thereafter audited or questioned by Comprehensive despite Comprehensive's knowledge that Roth was controlling KeyOp, that Roth was transferring client funds into

KeyOp, that this was contrary to Comprehensive's internal policy, and that this type of activity is frequently associated with securities violations and other illegal or improper acts.

15.    Additionally, 17 C.F.R. 275.206(4)-2 (hereafter the "Custody Rule") applies whenever an adviser or a related person holds, directly or indirectly, client funds or securities or has any authority to obtain possession of them.  The Custody Rule sets forth heightened supervisory and reporting duties for Investment Advisers, such as Comprehensive, when they have custody of client funds.   Roth's and, *ipso facto*, Comprehensive's custody of the client funds transferred to the KeyOp account triggered these heightened supervisory and reporting obligations on the part of Comprehensive.

16.    With respect to the client funds held in the KeyOp account between July 9, 2004 and March 12, 2010, the Custody Rule required, *inter alia*, that Comprehensive:

    a) Establish separate accounts maintained by a qualified custodian for each client's funds and securities under that clients' name or, in accounts that contained only its clients' funds and securities, under Comprehensive's name as agent or trustee for the clients;

    b) Upon opening such accounts, provide notice to clients, in writing, of the qualified custodian's name, address, and the manner in which the funds or securities were maintained;

    c) Have a reasonable basis for believing that the qualified custodian sends an account statement, at least quarterly, to each of the clients for which it maintains funds or securities, identifying the amount of funds and of each security in the account at the end of the period and setting forth all transactions during that period;

    d) As an alternative to subparagraph (c), send account statements, at least quarterly, to each of Comprehensive's clients for whom it had custody of funds or securities, identifying the amount of funds and of each security of which Comprehensive had custody at the end of the relevant period and set forth all transactions during that period; and

    e) If Comprehensive, rather than the qualified custodian, TD, sent the quarterly account statements, provide for a surprise audit by an independent accountant to verify all of these funds and securities by actual examination at least once a year.

17. Despite Comprehensive's knowledge of Roth's and, *ipso facto*, its custody of client funds through Roth's use of the KeyOp account, Comprehensive, upon information and belief, failed prior to March 12, 2010, to fulfill its duties and obligations as set forth in the Custody Rule discussed above.

18. With respect to the client funds held in the KeyOp account on and after March 12, 2010, the Custody Rule required, *inter alia*, that Comprehensive:

a) Have a qualified custodian maintain client funds and securities:

    (i)    In a separate account for each client under that client's name; or

    (ii)    In accounts that contain only Comprehensive's clients' funds and securities, under Comprehensive's name as agent or trustee for the clients;

b)  Notify the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained, promptly when the account is opened and following any changes to this information.  If Comprehensive sent account statements to a client to which it is required to provide this notice, in the notification provided to that client and in any subsequent account statements sent to that client, Comprehensive was to include a statement urging the client to compare the account statements from the custodian with those from the adviser;

c)  Have a reasonable basis, after due inquiry, for believing that the qualified custodian sends an account statement, at least quarterly, to each of Comprehensive's clients for which it maintains funds or securities, identifying the amount of funds and of each security in the account at the end of the period and setting forth all transactions in the account during that period; and

    d) Have the client funds and securities of which it has custody verified by actual examination at least once during each calendar year, by an independent public accountant, pursuant to a written agreement between Comprehensive and the accountant, at a time that is chosen by the accountant without prior notice or announcement and that is irregular from year to year.

19. Despite Comprehensive's knowledge of Roth's and, *ipso facto*, its custody of client funds through Roth's use of the KeyOp account, Comprehensive, upon information and belief, failed on and after March 12, 2010 to fulfill its duties and obligations as set forth in the Custody Rule discussed above.

20. As noted above, Roth also provided investment management services to certain individuals. In 2007 or 2008, Comprehensive's compliance officer was contacted by phone by a family member of one of the individual clients of Roth. The caller informed the compliance officer that she felt money was missing from the customer account. On information and belief, no investigation was made by Comprehensive.

21. In or about December, 2010, a Plan complained about missing funds. Comprehensive did not investigate this complaint.

22. In early 2011, it was discovered that Roth had misappropriated substantial amounts of funds from Plans and individuals (the "Stolen Monies") from approximately 2004 through 2011.

23. Roth carried out this misappropriation of Plan and individual funds in several ways. These included:

   a. Roth forged authorization letters, thereby allowing a Plan's mutual funds to be improperly transferred to KeyOp. Roth then used his control of KeyOp to sell the mutual funds and divert the proceeds to his own ends;

   b. Roth obtained standing authority to transfer mutual funds from several Plans. He used that authority to transfer Plan mutual funds to KeyOp. Roth then used his control of KeyOp to sell the mutual funds and divert the proceeds to his own ends or to use the shares as collateral for his own trading on margin in the KeyOp account; and/or

   c. Roth forged authorizations, or utilized blank authorizations signed by individual clients, and caused client funds to be directed to his own purposes.

24. During the relevant period, Comprehensive, on information and belief:

   a. Failed to have written policies and procedures which were reasonably designed to prevent violations of regulations and misappropriations of client funds by an associated person;

   b. Failed to implement and enforce its written policies and procedures in a manner reasonably designed to prevent violations of regulations and misappropriations of client funds by an associated person;

   c. Failed to conduct adequate reviews of Roth's activities;

   d. Failed to have adequate branch review visits to Roth's branch or adequate follow-up to such visits. For example, Comprehensive failed to follow up on certain observations brought to its attention by the person who conducted the branch visit in 2010;

   e. Failed to adequately train the supervisors who were doing branch reviews at Roth's branch office;

f. Failed to adequately identify to whom an associated person, such as Roth, internally reported or who was responsible for Roth's supervision on an ongoing basis;

g. Failed to devote adequate resources to its compliance program;

h. Failed to prevent Roth from utilizing KeyOp for custody of client accounts in violation of Comprehensive's internal policy;

i. Failed to comply with the heightened supervisory and reporting requirements triggered when Roth (and therefore Comprehensive) had custody of client funds;

j. Failed to engage an independent public accountant to conduct a surprise annual audit, as required by law, of client funds in the KeyOp account;

k. Failed to maintain separate accounts, in the name of the client or in its name as agent or trustee for the clients, for the client funds held in the KeyOp account as required by law.

l. Failed to comply with the notice requirement set forth in the Custody Rule.

m. Failed to send, or maintain a reasonable basis to believe that TD was sending, quarterly account statements, as required by law, regarding the funds held in the KeyOp account.

n. Failed to provide adequate oversight, such as requiring prior authorization of more than one person for transfers made from a client's account into KeyOp;

o. Failed to monitor KeyOp account activities;

p. Failed to perform examinations of Roth's activities relative to his clients' accounts;

q. Failed to monitor Roth's trades and personal investment activity as required by Comprehensive's compliance program, industry standards, and regulatory law;

r. Failed to note the unusual pattern of transfers of shares from accounts of Roth's clients to the KeyOp account;

s. Failed to note the unusual pattern of trading in Roth's accounts;

t. Failed to investigate Roth's transfers and trading as required under the circumstances;

u. Failed to adequately oversee outside business activities of Roth;

v. Failed to question why Roth's descriptions of the nature of his outside business activities differed on a yearly basis;

w. Failed to require Roth to seek preapproval to engage in outside business activities as required by Comprehensive's codes of ethics;

x. Failed to require Roth to utilize his Comprehensive e-mail for all communications as required by Comprehensive's compliance manual or to enforce the requirement that, if Roth utilized a third party e-mail address, Roth must forward all e-mails to Comprehensive;

y. Failed to assure that supervised persons were aware of or even acknowledged receipt of Comprehensive's codes of ethics;

z. Allowed Roth to carry on discretionary trading without proper approval as required by Comprehensive internal policy;

aa. Failed to adequately investigate Roth's customer's complaints of missing funds;

bb. Failed to prevent Roth's use of presigned letters of authorization in direct violation of Comprehensive's internal policy;

cc. Failed to verify customer signatures on authorization letters as required by Comprehensive's internal policy;

    dd.    Failed to confirm customer authorizations to transfer funds as required by Comprehensive's internal policy;

    ee.    Failed to require a letter of authorization from a customer prior to each transfer of client funds to the KeyOp account as required by Comprehensive internal policy;

    ff.    Failed to enforce its policy prohibiting false or artificial entries on any books, records, or accounts;

    gg.    Failed to enforce its policy prohibiting employees from signing another individual's name on any document; and/or

    hh.    Failed to regularly or adequately conduct daily, monthly, quarterly and annual reviews of investment advisor activities as required by Comprehensive internal policy.

25. On information and belief, over $16 million was misappropriated by Roth from Plans and his individual clients during the relevant time period utilizing KeyOp as described herein.

26. Mezolink, Celect, and VComm were direct or indirect recipients of some the Stolen Monies from KeyOp. As stated above, Roth controlled these companies, each of which was involved in some way in electronic commerce. KeyOp also directly transferred client funds to third parties determined by Roth and which were not related to clients.

27. When Roth's misappropriation was discovered, the Securities and Exchange Commission filed the SEC Suit, injunctive relief was entered to prevent further theft, and this Receiver was appointed.

28. Without further access to Stolen Monies, Mezolink, Celect, and VComm could no longer conduct business and failed and their enterprise value was lost.

29. Defrauded investors of Roth and business creditors of KeyOp, Mezolink, Celect, and VComm are seeking recovery from the Receivership for the Stolen Monies and for monies owed to creditors for business debt. The Receivership has been forced to incur legal and related expenses to address such claims and to marshal the assets of the Receiver Estates. The Receiver Estates may be subject to paying back the Stolen Monies and paying business debts.

**CLAIMS**

**Count I - Negligent Supervision**

30. The Receiver repeats and realleges Paragraphs 1-29 above.

31. Because Roth was an associated person and registered representative with Comprehensive, Comprehensive had a duty to supervise his work and investigate claims made about his performance, particularly (but not solely) with respect to claims of missing funds.

32. Comprehensive breached that duty as described in Paragraphs 6-29 above.

33. By reason of these acts of negligent supervision, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates, investors, and trade creditors.

## Count II - Breach of Fiduciary Duty

34. The Receiver repeats and realleges Paragraphs 1- 29.

35. At all relevant times, Comprehensive had a fiduciary duty to Roth's and its clients, including those Plans and individuals described above.

36. Comprehensive's failures described in Paragraphs 6-29 each constitute a breach of such fiduciary duty.

37. By reason of these breaches of fiduciary duty, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates, investors, and trade creditors.

## Count III - Securities Act Violation

38. The Receiver repeats and realleges Paragraphs 1-29.

39. The actions of Comprehensive violated 815 ILCS 5/12 F, I, and J.

40. By reason of these statutory violations, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates, investors, and trade creditors.

## Count IV - Aiding and Abetting

41. The Receiver repeats and realleges Paragraphs 1-29.

42. The said acts, errors, and omissions of Comprehensive were taken by Comprehensive with the knowledge that Roth (and therefore Comprehensive) was exercising custody over client funds and that Comprehensive was creating an

opportunity for Roth to carry out a scheme to steal investor funds. Comprehensive's actions substantially assisted Roth in carrying out this scheme.

43. Comprehensive was aware of Roth's transfer of client funds into the KeyOp account as described herein and that such activity was improper. Regardless, Comprehensive failed to regulate, monitor, or otherwise prevent Roth's transfer of client funds into the KeyOp account.

44. By reason thereof, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates, investors, and trade creditors.

**Count V – Breach of Fiduciary Duty (KeyOp)**

45. The Receiver repeats and realleges Paragraphs 1-29.

46. KeyOp (through the Receiver) brings this claim against Comprehensive.

47. Comprehensive, on information and belief, was an investment advisor for KeyOp.

48. Accordingly, Comprehensive had a fiduciary duty to KeyOp.

49. Comprehensive breached its fiduciary duty to KeyOp as described in Paragraphs 6-29 above.

50. By reason of these breaches of fiduciary duty, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates, investors, and trade creditors.

## Count VI – Contribution

51. This count is pleaded in the alternative to the preceding counts of this complaint.

52. The Receiver repeats and realleges Paragraphs 1-29.

53. Investors defrauded by Roth have filed claims against the Receiver Estates through the claims process established in the SEC Suit by the Receiver.

54. The basis of such claims is the conduct of Roth and KeyOp described above.

55. Should the investors prove loss against the Receiver Estates on their claims, Comprehensive's acts, errors, and omissions described in Paragraph 19 will have been a contributing cause of the investor loss.

56. Accordingly, the Receiver may seek a recovery in contribution from Comprehensive under 740 ILCS 100/1 et seq. for such portion of the investor loss that is shown to be the fault of Comprehensive.

## Prayer

WHEREFORE, the Receiver respectfully prays this Court to enter a judgment on his behalf and against Defendants, jointly and severally, for $20 million plus interest, to award the Receiver his costs of suit and attorney fees, and to grant such other and further relief as the Court deems proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Timothy L. Bertschy, Receiver

By:_____s/Timothy L. Bertschy_____
Timothy L. Bertschy – ARDC #199931
Gregory J. Rastatter – ARDC #6280965
Andrew J. Keyt – ARDC #627778
Brian M. Smith – ARDC # 6293822
Stacy E. Crabtree – ARDC #6304685
Patrick E. Poston – ARDC #6306753
HEYL, ROYSTER, VOELKER & ALLEN
124 SW Adams Street, Suite 600
Peoria, Illinois 61602
Telephone: 309.676.0400
Facsimile: 309.676.3374
tbertschy@heylroyster.com
grastatter@heylroyster.com
akeyt@heylroyster.com
bsmith@heylroyster.com
scrabtree@heylroyster.com
pposton@heylroyster.com

18328297