E-FILED
Monday, 23 July, 2012 03:06:43 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| TIMOTHY L. BERTSCHY, | ) | |
| Receiver, SENTARA HEALTHCARE, | ) | |
| TIC HOLDINGS, INC., and SUSAN | ) | |
| PATTERSON, AS SUCCESSOR TRUSTEE | ) | |
| OF THE ARTHUR T. HAMILTON TRUST | ) | |
| DATED MAY 9, 1995, AND THE | ) | |
| ELIZABETH F. HAMILTON TRUST | ) | |
| DATED MAY 9, 1995, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 12-2078 |
| | ) | |
| COMPREHENSIVE CAPITAL | ) | |
| MANAGEMENT, INC. and | ) | |
| COMPREHENSIVE ASSET | ) | |
| MANAGEMENT AND SERVICING, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES Receiver Timothy L. Bertschy ("Receiver"), SENTARA HEALTHCARE

("Sentara"), TIC HOLDINGS, INC. ("TIC"), and SUSAN PATTERSON, AS SUCCESSOR

TRUSTEE OF THE ARTHUR T. HAMILTON TRUST DATED May 9, 1995, AND THE

ELIZABETH F. HAMILTON TRUST DATED MAY 9, 1995, ("Hamilton Trusts"), by their

undersigned attorneys, and for their First Amended Complaint (and Demand for Jury

Trial) against Comprehensive Capital Management, Inc. and Comprehensive Asset



Management and Servicing, Inc., (collectively, "Comprehensive" or "Defendants") state as follows:

## INTRODUCTION

1.     The Receiver was appointed as Receiver of the Estate of Timothy J. Roth ("Roth"), KeyOp Exercise, Inc. ("KeyOp"), Mezolink, Inc. ("Mezolink"), VCN Celect.org, LLC ("Celect"), and VComm Networks of Canada ("VComm") by order of this Court on March 31, 2011 (the "Order") in ***United States Securities and Exchange Commission, Plaintiff v. Timothy J. Roth, Defendant, et al.***, USDC (CD-IL), Case No. 11-cv-2079. (the "SEC Suit").  A copy of the Order Appointing Receiver is attached as Exhibit A.

2.     The Order grants and assigns to the Receiver, *inter alia*, the following powers and duties:

  a.    To bring such legal actions based on law or equity in any state, federal, or foreign court as he deems necessary or appropriate in discharging his duties as Receiver;

  b.    To pursue, resist and defend all suits, actions, claims and demands that may now be pending or that may be brought by or asserted against the Receiver Estate; and

  c.    To take any action that could be taken by the officers, directors, partners, members, shareholders, and trustees of Defendant or Relief Defendants.

(Order, Ex. A at p. 3).

3.     In its order of June 2, 2011 (Doc. #45), this Court granted the Receiver's Motion for Leave to File Suit (Doc. #41).  In that order, this Court authorized the Receiver

to pursue claims against third parties on behalf of the companies and individual investors directly injured by Roth's actions and the failures of those associated with Roth. (Doc. #45, pp. 5-6).

4.      Acting pursuant to those powers and duties described above, the Receiver files this action to recover losses suffered by the Receiver Estates (as defined in the Order).

5.      Additionally, the following entities and/or individuals join in this suit as Plaintiffs in their name to recover their individual losses caused by the actions of Defendants: Sentara Healthcare; TIC Holdings, Inc.; and Susan Patterson, as Successor Trustee of the Arthur Hamilton Trust Dated May 9, 1995, and the Elizabeth F. Hamilton Trust Dated May 9, 1995.

## JURISDICTION AND VENUE

6.      This action is filed in the Federal Court which established the Receivership. The action seeks to accomplish the ends for which the Receivership was established. Accordingly, the action is properly filed in this Court. *See Pope v. Louisville, N.A. & C. By. Co.*, 173 U.S. 573, 577, 19 S.Ct. 500, 43 L.Ed. 814 (1899); *Tcherepnin v. Franz*, 485 F.2d. 1251, 1255-56 (7th Cir. 1973); *Cagan v. Intervest Midwest Real Estate Corp.*, 774 F.Supp. 1089, 1093 (N.D. Ill. 1991).

7.      Comprehensive Capital Management, Inc. is a New Jersey corporation with its principal place of business in Parsippany, New Jersey.   Comprehensive Asset

3

Management and Servicing, Inc. is a New Jersey corporation with its principal place of business in Parsippany, New Jersey.   Sentara is a Virginia corporation with its principal place of business in Norfolk, Virginia.  TIC is a Colorado corporation with its principal place of business in Steamboat Springs, Colorado.  Susan Patterson, as Trustee of the Arthur Hamilton Trust Dated May 9, 1995, and the Elizabeth F. Hamilton Trust Dated May 9, 1995, is a citizen of and domiciled in Illinois.  There is complete diversity of the parties and the amount in controversy exceeds $75,000 for each plaintiff claim.  This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1332.

8.     A substantial part of the events or omissions giving rise to this action occurred in Champaign-Urbana, Illinois.  Venue is thus appropriate in this Court and in this Division pursuant to 28 U.S.C. § 1391.

## BACKGROUND FACTS RELEVANT TO ALL CLAIMS

9.     Roth, a Champaign-Urbana, Illinois based investment adviser, misappropriated over $16 million worth of client funds from individuals and certain non-qualified option compensation plans ("Plans")  for which he (and thus Comprehensive) provided investment advice.

10.     From approximately 2002 until February 2011, Roth was an associated person to Defendant Comprehensive Capital Management, Inc. ("CCM") and/or CCM's predecessor firms.   During the same time period, Roth was also a registered representative for Defendant Comprehensive Asset Management and Servicing, Inc

4

("CAMAS") and/or CAMAS's predecessor firms.  At all times relevant herein, Roth could be fired or disciplined by Comprehensive or its predecessor firms and was subject to the employment policies and procedures that govern registered representatives and associated persons of Comprehensive.

11.    At relevant times, Roth also served Mezolink, Celect, and VComm in various capacities.  Roth controlled these companies at all relevant times.

12.    Roth also owned KeyOp until 2003, at which time he transferred record ownership to a third party.  Regardless of this transfer, Roth controlled KeyOp at all relevant times.  Roth maintained an account at TD Ameritrade (TD Waterhouse) ("TD") in KeyOp's name.

13.    As part of his work with Comprehensive, Roth (and thus Comprehensive) provided investment management services to Plans and individuals and served as the investment adviser to those Plans and individuals.

14.    The Plans were offered by several employers as a part of a special compensation program for certain of their employees.  Under the Plans, the special compensation was paid out to the employees through liquidation or conveyance of mutual funds which had been or were purchased with employer funds.  The mutual funds were maintained in a Plan's account at TD.

15.    The process for liquidation of mutual funds was supposed to work as follows:  when Roth was advised that an employee (i.e., a "participant" in a Plan) wanted

to take his/her compensation, Roth then calculated the amount of mutual funds necessary for the Plan to sell to generate the required amount of compensation. Roth obtained a letter of authorization from the employer, or in some cases a Plan trustee, allowing the required number of mutual fund shares to be transferred from the Plan's account at TD to KeyOp's account at TD. Upon receipt from Roth of the completed or signed authorization letter, TD transferred the requested mutual fund shares to the KeyOp account at TD. In certain instances, Roth acquired standing authorization to execute transfers of mutual fund shares from a Plan's account to KeyOp's account at TD. Roth then sold the shares while they were in the KeyOp account. Net monies from the sale, after appropriate withholding, should have been sent from KeyOp to the employee.

16.    Roth's use of KeyOp to receive Plan funds was improper and violated industry standards, Comprehensive's internal policies, and legal requirements. As stated above, Roth controlled KeyOp at all relevant times. Ownership and/or control by Roth over KeyOp put Roth, and therefore Comprehensive, in custody of client funds when Roth transferred and held client mutual fund shares in the KeyOp account. This process created a significant opportunity for misappropriation by Roth and triggered heightened regulatory and supervisory standards. Comprehensive failed to take protective procedural measures despite its knowledge of Roth's and, *ipso facto*, its custody of these client funds. This was also in direct violation of Comprehensive's

internal policy forbidding itself or employees from accepting or maintaining custody of client assets.

17.     Comprehensive knew or should have known of Roth's use of KeyOp as described herein.  In or about 2003, Comprehensive became aware that Roth owned KeyOP.  Comprehensive's compliance officer told Roth that under applicable law the KeyOp account could not be in Roth's name.  However, in further discussions, the compliance officer told Roth that he could put KeyOp and the KeyOp account in the name of a figurehead.  Roth made it clear to the compliance officer that he (Roth) would continue to control the KeyOp account.  On information and belief, the KeyOp account was never thereafter audited or questioned by Comprehensive despite Comprehensive's knowledge that Roth was controlling KeyOp, that Roth was transferring client funds into KeyOp, that this was contrary to Comprehensive's internal policies, and that this type of activity is frequently associated with securities violations and other illegal or improper acts.

18.     Additionally, 17 C.F.R. 275.206(4)-2 (hereafter the "Custody Rule") applies whenever an adviser or a related person holds, directly or indirectly, client funds or securities or has any authority to obtain possession of them.  The Custody Rule sets forth heightened supervisory and reporting duties for Investment Advisers, such as Comprehensive, when they have custody of client funds.  Roth's and, *ipso facto*,

Comprehensive's custody of the client funds transferred to the KeyOp account triggered these heightened supervisory and reporting obligations on the part of Comprehensive.

19.    With respect to the client funds held in the KeyOp account between July 9, 2004 and March 12, 2010, the Custody Rule required, *inter alia*, that Comprehensive:

a)  Establish separate accounts maintained by a qualified custodian for each client's funds and securities under that client's name or, in accounts that contained only its clients' funds and securities, under Comprehensive's name as agent or trustee for the clients;

b)  Upon opening such accounts, provide notice to clients, in writing, of the qualified custodian's name, address, and the manner in which the funds or securities were maintained;

c)  Have a reasonable basis for believing that the qualified custodian sends an account statement, at least quarterly, to each of the clients for which it maintains funds or securities, identifying the amount of funds and of each security in the account at the end of the period and setting forth all transactions during that period;

d)  As an alternative to subparagraph (c), send account statements, at least quarterly, to each of Comprehensive's clients for whom it had custody of funds or securities, identifying the amount of funds and of each security of

which Comprehensive had custody at the end of the relevant period and set forth all transactions during that period; and

e)  If Comprehensive, rather than the qualified custodian, TD, sent the quarterly account statements, provide for a surprise audit by an independent accountant to verify all of these funds and securities by actual examination at least once a year.

20.    Despite Comprehensive's knowledge of Roth's and, *ipso facto*, its custody of client funds through Roth's use and control of the KeyOp account while it held client funds, Comprehensive, upon information and belief, failed prior to March 12, 2010, to fulfill its duties and obligations as set forth in the Custody Rule discussed above.

21.    With respect to the client funds held in the KeyOp account on and after March 12, 2010, the Custody Rule required, *inter alia*, that Comprehensive:

a) Have a qualified custodian maintain client funds and securities:

   (i)     In a separate account for each client under that client's name; or

   (ii)    In accounts that contain only Comprehensive's clients' funds and securities, under Comprehensive's name as agent or trustee for the clients;

b)  Notify the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained, promptly

9

when the account is opened and following any changes to this information. If Comprehensive sent account statements to a client to which it is required to provide this notice, in the notification provided to that client and in any subsequent account statements sent to that client, Comprehensive was to include a statement urging the client to compare the account statements from the custodian with those from the adviser;

c) Have a reasonable basis, after due inquiry, for believing that the qualified custodian sends an account statement, at least quarterly, to each of Comprehensive's clients for which it maintains funds or securities, identifying the amount of funds and of each security in the account at the end of the period and setting forth all transactions in the account during that period; and

d) Have the client funds and securities of which it has custody verified by actual examination at least once during each calendar year, by an independent public accountant, pursuant to a written agreement between Comprehensive and the accountant, at a time that is chosen by the accountant without prior notice or announcement and that is irregular from year to year.

22. Despite Comprehensive's knowledge of Roth's and, *ipso facto*, its custody of client funds through Roth's use and control of the KeyOp account while it held client

10

funds, Comprehensive, upon information and belief, failed on and after March 12, 2010 to fulfill its duties and obligations as set forth in the Custody Rule discussed above.

23.     As noted above, Roth also provided investment management services to certain individuals.  In 2007 or 2008, Comprehensive's compliance officer was contacted by phone by a family member of one of the individual clients of Roth.  The caller informed the compliance officer that she felt money was missing from the customer account.   On information and belief, no investigation was made by Comprehensive.

24.     In or about December, 2010, a Plan complained about missing funds. Comprehensive did not investigate this complaint.

25.     In early 2011, it was discovered that Roth had misappropriated substantial amounts of funds from Plans and individuals (the "Stolen Monies") from approximately 2004 through 2011.

26.     Roth carried out this misappropriation of Plan and individual funds in several ways.  These included:

    a.     Roth forged authorization letters, thereby allowing a Plan's mutual funds to be improperly transferred to KeyOp.  Roth then used his control of KeyOp to sell the mutual funds and divert the proceeds to his own ends;

    b.     Roth obtained standing authority from several Plans to transfer mutual funds from those Plans.  He used that authority to transfer Plan mutual funds to KeyOp.  Roth then used his control of KeyOp to sell the mutual funds and divert the proceeds to his own ends or to use the shares as collateral for his own trading on margin in the KeyOp account; and/or

c.   Roth forged authorizations, or utilized blank authorizations signed by individual clients, and caused client funds to be directed to his own purposes.

27.   During the relevant period, Comprehensive, on information and belief:

a.   Failed to have written policies and procedures which were reasonably designed to prevent violations of regulations and misappropriations of client funds by an associated person;

b.   Failed to implement and enforce its written policies and procedures in a manner reasonably designed to prevent violations of regulations and misappropriations of client funds by an associated person;

c.   Failed to conduct adequate reviews of Roth's activities;

d.   Failed to have adequate branch review visits to Roth's branch or adequate follow-up to such visits.  For example, Comprehensive failed to follow up on certain observations brought to its attention by the person who conducted the branch visit in 2010;

e.   Failed to adequately train the supervisors who were doing branch reviews at Roth's branch office;

f.   Failed to adequately identify to whom an associated person, such as Roth, internally reported or who was responsible for Roth's supervision on an ongoing basis;

g.   Failed to devote adequate resources to its compliance program;

h.   Failed to prevent Roth from utilizing KeyOp for custody of client accounts in violation of Comprehensive's internal policy;

i.   Failed to comply with the heightened supervisory and reporting requirements triggered when Roth (and therefore Comprehensive) had custody of client funds;

j.      Failed to engage an independent public accountant to conduct a surprise annual audit, as required by law, of client funds in the KeyOp account;

k.      Failed to maintain separate accounts, in the name of the client or in its name as agent or trustee for the clients, for the client funds held in the KeyOp account as required by law.

l.      Failed to comply with the notice requirement set forth in the Custody Rule.

m.      Failed to send, or maintain a reasonable basis to believe that TD was sending, quarterly account statements, as required by law, regarding the funds held in the KeyOp account.

n.      Failed to provide adequate oversight, such as requiring prior authorization of more than one person for transfers made from a client's account into KeyOp;

o.      Failed to monitor KeyOp account activities;

p.      Failed to perform examinations of Roth's activities relative to his clients' accounts;

q.      Failed to monitor Roth's trades and personal investment activity as required by Comprehensive's compliance program, industry standards, and regulatory law;

r.      Failed to note the unusual pattern of transfers of shares from accounts of Roth's clients to the KeyOp account;

s.      Failed to note the unusual pattern of trading in Roth's accounts;

t.      Failed to investigate Roth's transfers and trading as required under the circumstances;

u.      Failed to adequately understand the outside business activities of Roth;

v.     Failed to question why Roth's descriptions of the nature of his outside business activities differed on a yearly basis;

w.     Failed to require Roth to seek preapproval to engage in outside business activities as required by Comprehensive's codes of ethics;

x.     Failed to require Roth to utilize his Comprehensive e-mail for all communications as required by Comprehensive's compliance manual or to enforce the requirement that, if Roth utilized a third party e-mail address, Roth must forward all e-mails to Comprehensive;

y.     Failed to assure that supervised persons were aware of or even acknowledged receipt of Comprehensive's code of ethics and its written supervisory procedures;

z.     Allowed Roth to carry on discretionary trading without proper approval as required by Comprehensive internal policy;

aa.    Failed to adequately investigate Roth's customers' complaints of missing funds;

bb.    Failed to prevent Roth's use of presigned letters of authorization in direct violation of Comprehensive's internal policy;

cc.    Failed to verify customer signatures on authorization letters as required by Comprehensive's internal policy;

dd.    Failed to confirm customer authorizations to transfer funds as required by Comprehensive's internal policy;

ee.    Failed to require a letter of authorization from a customer prior to each transfer of client funds to the KeyOp account as required by Comprehensive internal policy;

ff.    Failed to enforce its policy prohibiting false or artificial entries on any books, records, or accounts;

gg.    Failed to enforce its policy prohibiting employees from signing another individual's name on any document; and/or

14

hh.    Failed to regularly or adequately conduct daily, monthly, quarterly and annual reviews of investment advisor activities as required by Comprehensive internal policy.

28.    On information and belief, over $16 million was misappropriated by Roth from Plans and his individual clients during the relevant time period utilizing KeyOp as described herein.

29.    Mezolink, Celect, and VComm were direct or indirect recipients of some of the Stolen Monies from KeyOp.   As stated above, Roth controlled these companies, each of which was involved in some way in electronic commerce.   KeyOp also directly transferred client funds to third parties determined by Roth and which were not related to clients.

30.    As a result of Roth's fraud and the receipt of Stolen Monies, Mezolink, Celect, and VComm were artificially prolonged and continued in business past the point of insolvency.   This was and continues to be to the detriment of these entities, having caused them to incur substantial, unnecessary indebtedness for which they are now subject to repayment.

31.    When Roth's misappropriation was discovered, the Securities and Exchange Commission filed the SEC Suit, injunctive relief was entered to prevent further theft, and this Receiver was appointed.

32.    Without further access to Stolen Monies, Mezolink, Celect, and VComm could no longer conduct business and failed and their enterprise value was lost.  As a

result, they are unable to repay their substantial indebtedness which could have been avoided had Roth's fraud been prevented or discovered by Comprehensive.

33.     Defrauded investors of Roth and business creditors of KeyOp, Mezolink, Celect, and VComm are seeking recovery from the Receivership for the Stolen Monies and for monies owed to creditors for business debt.  The Receivership has been forced to incur legal and related expenses to address such claims and to marshal the assets of the Receiver Estates.  The Receiver Estates may be subject to paying back the Stolen Monies and paying business debts.

**BACKGROUND FACTS RELEVANT TO SENTARA**

34.     Sentara entered into an Investment Services Agreement with First Advisors Financial Group, LLC ("First Advisors") on or about January 1, 2004.  A copy of the Sentara Investment Services Agreement is attached hereto as Exhibit B.

35.     Upon information and belief, First Advisors was a predecessor firm to the Defendants such that Comprehensive was a mere business continuation of First Advisors.

36.     At all times relevant herein, Sentara was a client of Comprehensive and/or its predecessor firms.

37.     Pursuant to the Sentara Investment Services Agreement, Comprehensive and Tim Roth, an employee of and associated person to First Advisors and later Comprehensive, provided investment management services for Sentara.

38.     As a result of the conduct and failures of Comprehensive as set forth herein, Sentara was caused to suffer and continues to suffer substantial harm.  Roth was allowed to misappropriate approximately $7,455,666.04 of funds from Sentara as a result of Comprehensive's failure to prevent or discover Roth's fraud.

## BACKGROUND FACTS RELEVANT TO TIC

39.     TIC entered into an Investment Services Agreement with Northwest Quadrant Advisory Group, LLC ("Northwest Quadrant") on or about March 14, 2003.   A copy of the TIC Investment Services Agreement is attached hereto as Exhibit C.

40.     Upon information and belief, Northwest Quadrant was a predecessor firm to the Defendants such that Comprehensive was a mere business continuation of Northwest Quadrant.

41.     At all times relevant herein, TIC was a client of Comprehensive and/or its predecessor firms.

42.     Pursuant to the TIC Investment Services Agreement, Comprehensive and Tim Roth, an employee of and associated person to Northwest Quadrant and later Comprehensive, provided investment management services for TIC.

43.     As a result of the conduct and failures of Comprehensive as set forth herein, TIC was caused to suffer and continues to suffer substantial harm.  Roth was allowed to misappropriate approximately $3,012,959.39 of funds from TIC as a result of Comprehensive's failure to prevent or discover Roth's fraud.

## BACKGROUND FACTS RELEVANT TO HAMILTON TRUSTS

44.    Susan Patterson is the daughter of Arthur and Elizabeth Hamilton and the Successor Trustee of the Arthur T. Hamilton Trust Dated May 9, 1995, and the Elizabeth F. Hamilton Trust Dated May 9, 1995.  As such Trustee, she has the power and authority to bring the claims of the Hamilton Trusts as described herein.

45.    Elizabeth Hamilton entered into a Representative Management Account Agreement with Northwest Quadrant Advisory Group ("Northwest Quadrant") on or about May 31, 2002.  Elizabeth Hamilton entered into this agreement as the Trustee of both the Arthur T. Hamilton Trust Dated May 9, 1995, and the Elizabeth F. Hamilton Trust Dated May 9, 1995 ("Hamilton Trusts").   A copy of the Hamilton Trusts Representative Management Account Agreement is attached hereto as Exhibit D.

46.    Upon information and belief, Northwest Quadrant was a predecessor firm of the Defendants such that Comprehensive is a mere business continuation of Northwest Quadrant.

47.    At all times relevant herein, the Hamilton Trusts were clients of Comprehensive and/or its predecessor firms.

48.    Pursuant to the Hamilton Trusts Representative Management Account Agreement, Comprehensive and Tim Roth, an employee of and associated person to Northwest Quadrant and later Comprehensive, provided financial management services for the Hamilton Trusts.

49.     As a result of the conduct and failures of Comprehensive as set forth herein, the Hamilton Trusts were caused to suffer and continue to suffer substantial harm.  Roth was allowed to misappropriate approximately $385,000 of funds from the Hamilton Trusts as a result of Comprehensive's failure to prevent or discover Roth's fraud.

## CLAIMS

### Count I - Negligent Supervision (Receiver)

50.     The Receiver repeats and realleges Paragraphs 1-33 above.

51.     Because Roth was an associated person and registered representative with Comprehensive, Comprehensive had a duty to supervise his work and investigate claims made about his performance, particularly (but not solely) with respect to claims of missing funds.

52.     Comprehensive breached that duty as described in Paragraphs 9-33 above.

53.     By reason of these acts of negligent supervision, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates.

### Count II - Breach of Fiduciary Duty (Receiver)

54.     The Receiver repeats and realleges Paragraphs 1- 33.

55.     At all relevant times, Comprehensive had a fiduciary duty to Roth's and its clients, including those Plans and individuals described above.

56.     Comprehensive's failures described in Paragraphs 9-33 each constitute a breach of such fiduciary duty.

57.     By reason of these breaches of fiduciary duty, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates.

### Count III - Securities Act Violation (Receiver)

58.     The Receiver repeats and realleges Paragraphs 1-33.

59.     The actions of Comprehensive violated 815 ILCS 5/12 F, I, and J.

60.     By reason of these statutory violations, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates, investors, and trade creditors.

### Count IV - Aiding and Abetting (Receiver)

61.     The Receiver repeats and realleges Paragraphs 1-33.

62.     The said acts, errors, and omissions of Comprehensive were taken by Comprehensive with the knowledge that Roth (and therefore Comprehensive) was exercising custody over client funds and that Comprehensive was creating an opportunity for Roth to carry out a scheme to steal investor funds.  Comprehensive's actions and inactions substantially assisted Roth in carrying out this scheme.

63.     Comprehensive had knowledge of Roth's transfer of client funds into the KeyOp account as described herein and that such activity was improper.  Regardless, Comprehensive failed to regulate, monitor, or otherwise prevent Roth's transfer of client funds into the KeyOp account.

64.     By reason thereof, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates.

### Count V – Breach of Fiduciary Duty (KeyOp)

65.     The Receiver repeats and realleges Paragraphs 1-33.

66.     KeyOp (through the Receiver) brings this claim against Comprehensive.

67.     Comprehensive and/or its predecessor firms, on information and belief, were an investment advisor for KeyOp.

68.     Accordingly, Comprehensive had a fiduciary duty to KeyOp.

69.     Comprehensive breached its fiduciary duty to KeyOp as described in Paragraphs 9-33 above.

70.     By reason of these breaches of fiduciary duty, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Receiver Estates.

### Count VI – Contribution (Receiver)

71.     This count is pleaded in the alternative to the preceding counts of this complaint.

72.     The Receiver repeats and realleges Paragraphs 1-33.

73.     Investors defrauded by Roth have filed claims against the Receiver Estates through the claims process established in the SEC Suit by the Receiver.

74.     The basis of such claims is the conduct of Roth and KeyOp described above.

75.     Should the investors prove loss against the Receiver Estates on their claims, Comprehensive's acts, errors, and omissions described in Paragraph 27 will have been a contributing cause of the investor loss.

76.     Accordingly, the Receiver may seek a recovery in contribution from Comprehensive under 740 ILCS 100/1 et seq. for such portion of the investor loss that is shown to be the fault of Comprehensive.

### Count VII - Negligent Supervision (Sentara)

77.     Sentara repeats and realleges Paragraphs 1-38.

78.     Because Roth was an associated person and registered representative with Comprehensive, Comprehensive had a duty to supervise his work and investigate claims made about his performance, particularly (but not solely) with respect to claims of missing funds.

79.     Comprehensive breached that duty as described in Paragraphs 9-33 above.

80.    By reason of these acts of negligent supervision, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by Sentara.

### Count VIII - Breach of Fiduciary Duty (Sentara)

81.    Sentara repeats and realleges Paragraphs 1- 38.

82.    At all relevant times, Comprehensive had a fiduciary duty to Roth's and its clients, including Sentara.

83.    Comprehensive's failures described in Paragraphs 9-33 each constitute a breach of such fiduciary duty.

84.    By reason of these breaches of fiduciary duty, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by Sentara.

### Count IX - Securities Act Violation (Sentara)

85.    Sentara repeats and realleges Paragraphs 1-38.

86.    The actions of Comprehensive set forth above violated 815 ILCS 5/12 F, I, and J.

87.    By reason of these statutory violations, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by Sentara.

### Count X - Aiding and Abetting (Sentara)

88.    Sentara repeats and realleges Paragraphs 1-38.

89.    The said acts, errors, and omissions of Comprehensive were taken by Comprehensive with the knowledge that Roth (and therefore Comprehensive) was exercising custody over client funds and that Comprehensive was creating an opportunity for Roth to carry out a scheme to steal investor funds.  Comprehensive's actions and inactions substantially assisted Roth in carrying out this scheme.

90.    Comprehensive had knowledge of Roth's transfer of client funds into the KeyOp account as described herein and that such activity was improper.  Regardless, Comprehensive failed to regulate, monitor, or otherwise prevent Roth's transfer of client funds into the KeyOp account.

91.    By reason thereof, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by Sentara.

### Count XI – Breach of Contract (Sentara)

92.    Sentara repeats and realleges Paragraphs 1-38.

93.    The agreement between Sentara and First Advisors, and later Comprehensive as a mere business continuation of First Advisors, represents a valid and enforceable contract whereby both parties were mutually obligated.  See Exhibit B, Sentara Investment Services Agreement.

94. Sentara at all times relevant hereto performed its obligations under the contract.

95. Comprehensive's failures described in Paragraphs 9-33 above each constitute a breach of such contract.

96. By reason of these breaches of contract, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by Sentara.

### Count XII - Negligent Supervision (TIC)

97. TIC repeats and realleges Paragraphs 1-33 and 39-43.

98. Because Roth was an associated person and registered representative with Comprehensive, Comprehensive had a duty to supervise his work and investigate claims made about his performance, particularly (but not solely) with respect to claims of missing funds.

99. Comprehensive breached that duty as described in Paragraphs 9-33 above.

100. By reason of these acts of negligent supervision, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by TIC.

### Count XIII - Breach of Fiduciary Duty (TIC)

101. TIC repeats and realleges Paragraphs 1-33 and 39-43.

102.    At all relevant times, Comprehensive had a fiduciary duty to Roth's and its clients, including TIC.

103.    Comprehensive's failures described in Paragraphs 9-33 each constitute a breach of such fiduciary duty.

104.    By reason of these breaches of fiduciary duty, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by TIC.

### Count XIV - Securities Act Violation (TIC)

105.    TIC repeats and realleges Paragraphs 1-33 and 39-43.

106.    The actions of Comprehensive violated 815 ILCS 5/12 F, I, and J.

107.    By reason of these statutory violations, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by TIC.

### Count XV - Aiding and Abetting (TIC)

108.    TIC repeats and realleges Paragraphs 1-33 and 39-43.

109.    The said acts, errors, and omissions of Comprehensive were taken by Comprehensive with the knowledge that Roth (and therefore Comprehensive) was exercising custody over client funds and that Comprehensive was creating an opportunity for Roth to carry out a scheme to steal investor funds.  Comprehensive's actions and inactions substantially assisted Roth in carrying out this scheme.

110.   Comprehensive had knowledge of Roth's transfer of client funds into the KeyOp account as described herein and that such activity was improper.   Regardless, Comprehensive failed to regulate, monitor, or otherwise prevent Roth's transfer of client funds into the KeyOp account.

111.   By reason thereof, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by TIC.

### Count XVI – Breach of Contract (TIC)

112.   TIC repeats and realleges Paragraphs 1-33 and 39-43.

113.   The agreement between TIC and Northwest Quadrant, and later Comprehensive as a mere business continuation of Northwest Quadrant, represents a valid and enforceable contract whereby both parties were mutually obligated.   See Exhibit C, TIC Investment Services Agreement.

114.   TIC at all times relevant hereto performed its obligations under the contract.

115.   Comprehensive's failures described in Paragraphs 9-33 above each constitute a breach of such contract.

116.   By reason of these breaches of contract, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by TIC.

## Count XVII - Negligent Supervision (Hamilton Trusts)

117.   The Hamilton Trusts repeat and reallege Paragraphs 1-33 and 44-49.

118.   Because Roth was an associated person and registered representative with Comprehensive, Comprehensive had a duty to supervise his work and investigate claims made about his performance, particularly (but not solely) with respect to claims of missing funds.

119.   Comprehensive breached that duty as described in Paragraphs 9-33 above.

120.   By reason of these acts of negligent supervision, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Hamilton Trusts.

## Count XVIII – Breach of Fiduciary Duty (Hamilton Trusts)

121.   The Hamilton Trusts repeat and reallege Paragraphs 1-33 and 44-49.

122.   At all relevant times, Comprehensive had a fiduciary duty to Roth's and its clients, including the Hamilton Trusts.

123.   Comprehensive's failures described in Paragraphs 9-33 each constitute a breach of such fiduciary duty.

124.   By reason of these breaches of fiduciary duty, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Hamilton Trusts.

## Count XIX – Securities Act Violation (Hamilton Trusts)

125.    The Hamilton Trusts repeat and reallege Paragraphs 1-33 and 44-49.

126.    The actions of Comprehensive violated 815 ILCS 5/12 F, I, and J.

127.    By reason of these statutory violations, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Hamilton Trusts.

## Count XX – Aiding and Abetting (Hamilton Trusts)

128.    The Hamilton Trusts repeat and reallege Paragraphs 1-33 and 44-49.

129.    The said acts, errors, and omissions of Comprehensive were taken by Comprehensive with the knowledge that Roth (and therefore Comprehensive) was exercising custody over client funds and that Comprehensive was creating an opportunity for Roth to carry out a scheme to steal investor funds.  Comprehensive's actions and inactions substantially assisted Roth in carrying out this scheme.

130.    Comprehensive had knowledge of Roth's transfer of client funds into the KeyOp account as described herein and that such activity was improper.  Regardless, Comprehensive failed to regulate, monitor, or otherwise prevent Roth's transfer of client funds into the KeyOp account.

131.    By reason thereof, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Hamilton Trusts.

### Count – XXI – Breach of Contract (Hamilton Trusts)

132.    The Hamilton Trusts repeat and reallege Paragraphs 1-33 and 44-49.

133.    The agreement between the Hamilton Trusts and Northwest Quadrant, and later Comprehensive as a mere business continuation of Northwest Quadrant, represents a valid and enforceable contract whereby both parties were mutually obligated.  See Exhibit D, Hamilton Trusts Representative Management Account Agreement.

134.    The Hamilton Trusts at all times relevant hereto performed their obligations under the contract.

135.    Comprehensive's failures described in Paragraphs 9-33 above each constitute a breach of such contract.

136.    By reason of these breaches of contract, or any one of them, Roth's said theft was allowed and the losses and damages identified above were and are being suffered by the Hamilton Trusts.

### Prayer

WHEREFORE, the Receiver respectfully prays this Court to enter judgment for each of the Receiver Estates, Sentara, TIC, and the Hamilton Trusts, against Defendants, jointly and severally, for the losses of each such plaintiff as described herein, plus interest, to award plaintiffs their costs of suit and attorney fees, and to grant such other and further relief as the Court deems proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY**

TIMOTHY L. BERTSCHY, Receiver,
SENTARA HEALTHCARE, TIC HOLDINGS,
INC., and SUSAN PATTERSON, AS
SUCCESSOR TRUSTEE OF THE ARTHUR
T. HAMILTON TRUST DATED MAY 9,
1995, AND THE ELIZABETH F.
HAMILTON TRUST DATED MAY 9, 1995

By:_____s/Patrick E. Poston_____
Timothy L. Bertschy – ARDC #199931
Gregory J. Rastatter – ARDC #6280965
Andrew J. Keyt – ARDC #627778
Brian M. Smith – ARDC # 6293822
Stacy E. Crabtree – ARDC #6304685
Patrick E. Poston – ARDC #6306753
HEYL, ROYSTER, VOELKER & ALLEN
124 SW Adams Street, Suite 600
Peoria, Illinois 61602
Telephone: 309.676.0400
Facsimile: 309.676.3374
tbertschy@heylroyster.com
grastatter@heylroyster.com
akeyt@heylroyster.com
bsmith@heylroyster.com
scrabtree@heylroyster.com
pposton@heylroyster.com

18328297

**E-FILED**
Thursday, 31 March, 2011 03:45:04 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TIMOTHY J. ROTH | ) ) | No. 11-cv-2079 |
| Defendant, | ) ) | |
| and | ) ) | |
| KEYOP EXERCISE, INC., MEZOLINK, INC. (F/K/A INTEGRATED DATA SECURITY, INC.), VCN CELECT.ORG, LLC, VCOMM NETWORKS OF CANADA, | ) ) ) ) ) | |
| Relief Defendants. | ) ) | |

## ORDER APPOINTING RECEIVER

On the basis of Plaintiff United States Securities and Exchange

Commission's Motion Concerning a Court-Imposed Receiver (Docket No. 26), the

Court having been advised in the premises and having considered the materials

before it:

**IT IS HEREBY ORDERED THAT:**

The Court appoints Timothy Bertschy, as Receiver, without bond, for (1)

the estate of Defendant Timothy J. Roth ("Defendant" or "Roth"); (2) Relief



EXHIBIT
A

Defendants KeyOp Exercise, Inc., Mezolink, Inc., VCN Celect.org, LLC, and

Vcomm Networks of Canada (together the "Relief Defendants"); (3) all funds,

accounts, and other assets held by or for the benefit of Defendant or Relief

Defendants that were received, directly or indirectly, from Defendant or Relief

Defendant or were acquired with funds or other assets received, directly or

indirectly, from Defendant or Relief Defendant; and (4) every other corporation,

company, partnership, trust and/or other entity (regardless of form) that is directly

or indirectly owned by or under the direct or indirect control of Defendant or

Relief Defendants (hereinafter (1)-(4) are collectively referred to as "Receiver

Estates").

     **IT IS FURTHER ORDERED THAT:**

I.

The Receiver shall have the following powers and duties:

     A.   To use reasonable efforts to determine the nature, location and value

of all assets and property that the Receiver Estates own, possess, have a beneficial

interest in, or control;

     B.   To engage and employ the law firm of Heyl Royster and, with the

approval of the Court, any individuals or entities the Receiver deems necessary to

assist in his duties ("Retained Personnel");

     C.   To take custody, control and possession of all the funds, property,

premises, leases, and other assets of or in the possession or under the direct or

2

indirect control of the Receiver Estates, to manage, control, operate and maintain the Receiver Estates, to use income, earnings, rents and profits of the Receiver Estates, with full power to sue for and collect, recover, receive and take into possession all goods, chattels, rights, credits, monies, effects, lands, books and records of accounts and other papers of the Receiver Estates;

D.   To bring such legal actions based on law or equity in any state, federal, or foreign court as he deems necessary or appropriate in discharging his duties as Receiver;

E.   To pursue, resist and defend all suits, actions, claims and demands that may now be pending or that may be brought by or asserted against the Receiver Estates;

F.   To make such payments and disbursements from the funds so taken into his custody, control and possession or thereafter received, and to incur such expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

G.   To take such action as necessary and appropriate to prevent the dissipation or concealment of any funds or assets or for the preservation of any such funds and assets of the Receiver Estates;

H.   To have the authority to issue subpoenas to compel testimony of persons or production of records, consistent with the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Central

3

District of Illinois (without being subject to the limits imposed by Fed. R. Civ. P.

26(d)(1), except that notice of a subpoena does not have to be provided by the

Receiver to any party) concerning any subject matter relating to the identification,

preservation, collection and/or liquidation of the Receiver Estates;

  I. To take any action that could be taken by the officers, directors,

partners, members, shareholders, and trustees of Defendant or Relief Defendants;

  J. To take such other action as may be approved by this Court.

## II.

  The Receiver and Retained Personnel are entitled to reasonable

compensation and expense reimbursement from the Receiver Estate, which will be

determined based upon a financial framework to be established by the Court in

consultation with the Receiver, except that amounts paid to the Receiver and

Retained Personnel shall be paid solely from the assets frozen by (i) the Court's

Order dated March 21, 2011 in this action (the "Asset Freeze Order"), and (ii) any

recoveries stemming from actions brought by the Receiver on behalf of aggrieved

investors, against third-parties, as authorized by this Court, and any extensions,

renewals or modifications thereof. The Receiver and Retained Personnel shall

apply to the Court for such compensation and expense reimbursement from time-

to-time.

4

### III.

The Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary duties and obligations in this matter unless and until this Court so orders.

### IV.

The Receiver and Retained Personnel are entitled to rely on all outstanding rules of law and Court orders and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

### V.

The Receiver shall open a bank account for the purposes of depositing the Receiver Estates' frozen funds and any other funds the Receiver may recover. The Receiver shall use such funds for any legitimate purpose consistent with the Receiver's powers and duties and this Order, including paying fees and expenses of the Receiver and Retained Personnel, as approved by the Court.

5

## VI.

Defendant Roth and Relief Defendants KeyOp Exercise, Inc., Mezolink, Inc., VCN Celect.org, LLC, and Vcomm Networks of Canada, their agents, servants, employees, independent contractors, and attorneys, and any persons acting for or on behalf of the Receiver Estates, are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

## VII.

All investors, borrowers, creditors, and other persons, and all others acting on behalf of any such investor, borrower, creditor or other persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees, independent contractors, and attorneys, are stayed from:

A.   Commencing, prosecuting, continuing, settling, or enforcing any suit, proceeding, award, judgment, settlement or lien against or affecting any of the Receiver Estates;

B.   Using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any assets of the Receiver Estates, including, without limitation, any property owned by or in the possession of the Receiver Estates, wherever situated;

6

C.  Attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement with or otherwise affecting the Receiver Estates, without the agreement of the Receiver; and

D.  Doing any act that may interfere with the taking control, possession, or management, by the Receiver, of any assets of the Receiver Estates, diminish the value of the assets of the Receiver Estates, in any way interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receiver Estates.

## VIII.

From time to time, upon application of the Receiver, the Court shall reissue this Order and upon applications of the Receiver may amend this Order.

## IX.

All persons, and all others acting on behalf of any such persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees, independent contractors, and attorneys, are ordered to turn over to the Receiver any and all property of any nature, including but not limited to all real and personal property; businesses; accounts; documents, electronically stored information, and tangible things as defined in Rule 34 of the Federal Rules of Civil Procedure; and any other asset of any kind of which any of the Receiver Estates are the owners or have an interest in immediately upon receiving notice of the

7

entry of this Order.

## X.

No person holding or claiming any position of any sort with any of the Receiver Estates shall possess any authority to act by or on behalf of any of the Receiver Estates.

## XI.

No officers, directors, partners, members, shareholders, and trustees of any corporations, partnerships, companies, trusts and/or other entity (regardless of form) that are among the Receiver Estates shall exercise any of their rights or powers with respect to the Receiver Estates until further order of the Court.

## XII.

Defendant Roth and Relief Defendants KeyOp Exercise, Inc., Mezolink, Inc., VCN Celect.org, LLC, and Vcomm Networks of Canada, as well as their agents, servants, employees, independent contractors, attorneys, any persons acting for or on behalf of the Receiver Estates, and any persons receiving notice of this Order by personal service or otherwise, are hereby restrained and enjoined from disposing, transferring, exchanging, assigning, or in any way conveying any property or assets of the Receiver Estates, and are restrained and enjoined from transacting any business of the Receiver Estates, except with the prior approval of the Receiver.

8

## XIII.

Defendant Roth and Relief Defendants KeyOp Exercise, Inc., Mezolink, Inc., VCN Celect.org, LLC, and Vcomm Networks of Canada, their agents, servants, employees, independent contractors, and attorneys, any persons acting for or on behalf of the Receiver Estates, and any persons receiving notice of this order by personal service or otherwise, having possession of any property of any nature, including but not limited to all real and personal property; businesses; accounts; documents, electronically stored information, and tangible things as defined in Rule 34 of the Federal Rules of Civil Procedure; and any other asset of any kind of the Receiver Estates are hereby directed to deliver the same to the Receiver, his agents and/or employees.

## XIV.

Defendant Roth and Relief Defendants KeyOp Exercise, Inc., Mezolink, Inc., VCN Celect.org, LLC, and Vcomm Networks of Canada, their agents, servants, employees, independent contractors, attorneys, any persons acting for or on behalf of the Receiver Estates, and entities under their direct or indirect control shall cooperate with and assist the Receiver and shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver, in the performance of his duties.

## XV.

Any brokerage institution, financial institution, bank, savings and loan, mutual fund, or any other person, partnership, or corporation maintaining or having custody or control of any brokerage or deposit account or other assets of any of the Receiver Estates or under their control, that receives actual notice of this Order by personal service, facsimile transmission or otherwise shall, within three (3) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice.

## XVI.

The Receiver shall be empowered, but is not required, to file voluntary petitions for relief under Title 11 of the United States Code (the Bankruptcy Code) for the Receiver Estates. If a bankruptcy petition is filed, the Receiver shall become, and shall be empowered to operate each of the Receiver Estates as a debtor in possession. The Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Should the Receiver elect to file petitions under Title 11 of the United States Code for any of the Receiver Estates, he shall have 15 days from the date of such filing to file with the Bankruptcy Court any lists or schedules

10

required to be filed with such petitions, this Court recognizing that the Receiver will require time to assemble such data for filing.

## XVII.

The Receiver is authorized to communicate with all such persons as he deems appropriate to inform them of the status of this matter and the financial condition of the Receiver Estates. The Receiver is further authorized to record this Order with government offices and to serve this Order on any person as he deems appropriate in furtherance of his responsibilities in this matter. All government offices that maintain public files of security interests in real and personal property are hereby ordered to record this Order when requested to do so by the Receiver or the Commission.

## XVIII.

The Receiver shall promptly notify the Court and counsel for the Commission of any failure or apparent failure of Defendant Roth and Relief Defendants KeyOp Exercise, Inc., Mezolink, Inc., VCN Celect.org, LLC, and Vcomm Networks of Canada to comply in any way with the terms of this Order.

11

## XIX.

No provision of this Order shall require the waiver of, or otherwise impinge upon, any person's rights to assert any applicable constitutional or other privilege in lieu of complying with the terms of this Order.

**SO ORDERED.**


3/31/2011                                    s/ Michael M. Mihm

**DATE**                                     **UNITED STATES DISTRICT JUDGE**

Exhibit A
Investment Services Agreement

THIS AGREEMENT made and entered into this 1st day of January, 2004, by and between FIRST ADVISORS FINANCIAL GROUP LLC, a Limited Liability Company organized and existing under the laws of Delaware ~New Jersey~, with offices located at 2001 Rt. 46, Ste. 506, Parsippany, NJ 07054, hereinafter referred to as "FAFG," and Sentara Healthcare, with offices located at 6015 Poplar Hall Drive, Ste. 314, Norfolk, VA 23502, hereinafter referred to as "Sentara", for services rendered by FAFG in connection with the **Sentara Option Plan for Executives ("Plan")**;

WITNESSETH:

WHEREAS, Sentara desires to utilize the services of FAFG for the Plan; and

WHEREAS, the parties have agreed upon the terms, covenants and conditions of the relationship, all as contained herein;

NOW, THEREFORE, IT IS AGREED by and between the parties as follows:

1. Sentara wishes to custody client funds (trust or otherwise) at TD Waterhouse (hereinafter referred to as "Brokerage Firm") or other brokerage firms designated by Sentara for the purpose of having the Brokerage Firm invest the funds in accordance with the direction of Sentara. A copy of the Brokerage Firm Account Application is attached hereto and incorporated by reference, as Exhibit A. Sentara agrees to execute such Agreement and any special Addendum identified and attached hereto which authorizes FAFG to properly manage Plan assets as directed by Sentara, KEY Option Services (KOS) or KEYSoft Consulting Group, LLC (KEYSoft) as agents.

2. FAFG agrees to provide services with respect to the funds of Sentara. The services of FAFG include placing custody of plan assets with the Brokerage Firm and may include rendering of advice with respect to Mutual Fund selections for use within the Plan and the rendering of advice to individual Plan participants regarding their selection of Mutual Funds for potential option grants. FAFG reserves the right to provide these services through arrangements it has with KEYSoft and KOS. KEYSoft and KOS are unaffiliated consulting firm; however, its principal, Timothy J. Roth, is acknowledged by Sentara as also being an investment advisory agent with FAFG.

3. Sentara hereby grants to FAFG the absolute and unlimited right to execute all directions provided to FAFG by KOS and/or KEYSoft acting as agent of KOS who is acting as agent of Sentara with respect to the funds deposited with Brokerage Firm hereto. This right shall include the right to designate the type of investment, the amount of the investment, the reinvestment of the funds, the termination of an investment, and a direction to distribute the funds or Assets to Sentara or Plan Participant. FAFG shall notify Sentara of any investments which provide for such a penalty.

14



SENTARA00103

4. Sentara agrees that funds delivered to Brokerage Firm pursuant to the Brokerage Application Agreement attached hereto may be increased or decreased, from time to time, by Sentara. In the event of a request by Sentara to withdraw part or all of the funds, sufficient notice shall be given to FAFG for the withdrawal of the funds, and withdrawal requests shall be made in writing. Sufficient notice shall mean not less than five (5) working days notice.

Sentara hereby acknowledges that certain investments may be made which may provide for a penalty in the event of early or premature termination.

5. Sentara understands that Sentara will be responsible for the payment of all taxes, both federal and state, levied in connection with such investments. Any taxes levied in connection with the transfer of securities shall also be the responsibility and expense of Sentara.

6. FAFG agrees that it will maintain records of the investments made by Sentara pursuant to this Agreement and will submit to Sentara a monthly statement showing all receipts and disbursements. In this regard, a copy of the report from Brokerage Firm may be utilized by FAFG. In addition, an annual report will be forwarded to Sentara reflecting all transactions during the year, including investments made, receipts and disbursements, investments in place at the end of the year, and the appropriate value of the investments as of the end of the year.

7. This Agreement will commence at the time of its execution and shall continue until sixty (60) days after either party has given notice of its intention to terminate this Agreement. Termination of the Agreement between Sentara and Key Option Services shall terminate this Agreement.

8. All notices and reports shall be forwarded to Sentara at the address indicated below. In the event of a change of address, Sentara agrees to notify FAFG, in writing.

For the purposes of all notices and written communication, the address of FAFG shall be Attn: Timothy J. Roth, 2402 Windsor Place, Champaign, IL 61820, telephone number (217) 239-0179 or (217) 202-3244. Any complaints regarding the services of FAFG should be directed to Ronald Rollins, First Advisors Financial Group, 2001 Rt. 46 Suite 506, Parsippany, NJ 07054, telephone 973-394-0404.

9. FAFG shall not be responsible for the safe keeping of any of the securities evidencing the investment of Sentara, it being agreed and understood that the securities will be in the custody of Brokerage Firm pursuant to the Agreement attached hereto.

10. Sentara acknowledges that KEY Option Services will share fees received as compensation from Sentara as agreed to in the accompanying "Administration and Investment Services Agreement for the Sentara Option Plan for Executives" with FAFG.

11. FAFG shall look solely to KEYSoft and KOS for payment. Sentara Healthcare and the enrollees shall be responsible for paying the fees listed in the Agreement between Sentara Healthcare and Key Option Services.

15.

SENTARA00104

12. This advisory agreement may not be assigned without Sentara's express written consent.

IN WITNESS WHEREOF, the parties hereto have set their hand and seal the day and year first written above.

First Advisors Financial Group LLC

By it's President, Tim Smith

Sentara Healthcare

Signature(s)
Michael V. Taylor, VP Human Resources
Sentara Healthcare
6015 Poplar Hall Drive, Ste. 314
Norfolk, VA 23502

Tax ID Number

Transfer of approximately $7,000,000
Initial Amount of Funds Deposited

G:\WORDPROC\LEGAL\SANDRA\Key Option Service 3.doc.

16

SENTARA00105

TIC Holdings and Subsidiaries

# AGREEMENT FOR INVESTMENT SERVICES

THIS AGREEMENT made and entered into this _14_ day of _March_, 2003, by and between NORTHWEST QUADRANT ADVISORY GROUP, LLC, a Limited Liability Company organized and existing under the laws of Delaware, with offices located at 2001 Rt. 46, Ste. 506, Parsippany, NJ 07054, hereinafter referred to as "NQA," and TIC Holdings, Inc., , a Colorado corporation with offices located at 2211 Elk River Road, Steamboat Springs, Colorado 80477, hereinafter referred to as ("Client"), for services rendered by NQA in connection with The TIC Holdings and Subsidiaries FlexOP Program ("Plan").

WITNESSETH:

WHEREAS, Client desires to utilize the services of NQA for The TIC Holdings and Subsidiaries FlexOP Program; and,

WHEREAS, the parties have agreed upon the terms, covenants and conditions of the relationship, all as contained herein;

NOW, THEREFORE, IT IS AGREED by and between the parties as follows:

1.      Client wishes to custodialize client funds (trust or otherwise) at TD Waterhouse (hereinafter referred to as "Brokerage Firm") or other brokerage firms designated by NQA and Client agrees to the use of such other firm in writing, for the purpose of having the Brokerage Firm invest the funds in accordance with the direction of the TIC Holdings and Subsidiaries or The TIC Holdings and Subsidiaries FlexOP Program. A copy of the Brokerage Firm Account Application is attached hereto and incorporated by reference, as Exhibit A. Client agrees to execute such Agreement and any special Addendum identified and attached hereto which authorizes NQA to properly manage Plan assets as directed by TIC Holdings and Subsidiaries, The TIC Holdings and Subsidiaries FlexOP Program, KEY Option Services (KOS) or KEYSoft Consulting Group, LLC (KEYSoft) as agents.

1.      NQA agrees to provide services with respect to the funds of Client. The services of NQA include custodializing plan assets with the Brokerage Firm and may include rendering of advice with respect to Mutual Fund selections for use within the Plan and the rendering of advice to individual Plan participants regarding their selection of Mutual Funds for potential option grants. NQA reserves the right to provide these services through arrangements it has with KEYSoft and KOS. KEYSoft and KOS are unaffiliated consulting firm; however, its principal, Timothy J. Roth, is acknowledged by TIC Holdings and Subsidiaries as also being an investment advisory agent with NQA..

1.      Client hereby grants to NQA the absolute and unlimited right to execute all directions provided to NQA by KOS and/or KEYSoft acting as agent of KOS who is acting as agent of TIC Holdings and Subsidiaries with respect to the funds deposited with Brokerage Firm hereto. This right shall include the right to designate the type of investment, the amount of the investment, the reinvestment of the funds, the termination of an investment, and a direction to distribute the funds or Assets to Client or Plan Participant.

1.      Client agrees that funds delivered to Brokerage Firm pursuant to the Brokerage Application Agreement attached hereto may be increased or decreased, from time to time, by Client. In the event of a request by Client to withdraw part or all of the funds, sufficient notice shall be given to NQA for the withdrawal of the funds, and withdrawal requests shall be made in writing. Sufficient notice shall mean not less than five (5) working days notice

Client hereby acknowledges that certain investments may be made which may provide for a penalty in the event of early or premature termination.

EXHIBIT

C

ALL-STATE LEGAL®

**TIC Holdings and Subsidiaries**

5.    Client understands that Client will be responsible for the payment of all taxes, both federal and state, levied in connection with such investments.  Any taxes levied in connection with the transfer of securities shall also be the responsibility and expense of Client.

Client agrees to pay a fee to NQA, for the services of NQA based on the following schedule:  An annual fee, paid on a quarterly basis, will be charged at the beginning of each calendar quarter and billed separately to the corporation, unless other arrangements are made, according to the attached <u>Addendum A – Fee Schedule</u>.  In the event of a partial or complete termination of the Investment Account, or Accounts, prior to the end of a calendar quarter, any unearned fee will be credited against the following quarter's fee due.  In the event of termination of this agreement, any unearned fee amount (less any other amounts due to NQA) shall be refunded by NQA.  Distributions to Plan participants will not be subject to termination fees.  Prior to the custodian tendering the management fee, NQA will send to the client and the custodian at the same time, a bill showing the amount of the fee, the value of the client's assets on which the fee was based, and the specific manner in which the fee was calculated.

6.    NQA agrees that it will maintain records of the investments made by Client pursuant to this Agreement and will submit to Client a monthly statement showing all receipts and disbursements.  In this regard, a copy of the report from Brokerage Firm may be utilized by NQA.  In addition, an annual report will be forwarded to Client reflecting all transactions during the year, including investments made, receipts and disbursements, investments in place at the end of the year, and the appropriate value of the investments as of the end of the year.

7.    This Agreement will commence at the time of its execution and shall continue as long as funds are being invested pursuant to the advice of NQA hereunder.

8.    All notices and reports shall be forwarded to Client at the address indicated below.  In the event of a change of address, Client agrees to notify NQA, in writing.

For the purposes of all notices and written communication, the address of NQA shall be Attn: Timothy J Roth, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, telephone number ▮▮▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮ ▮▮▮▮.  Any complaints regarding the services of NQA should be directed to Ronald Rollins, Northwest Quadrant Advisory Group, 2001 Rt. 46 Suite 506, Parsippany, NJ  07054, telephone 973-394-0404.

9.    NQA shall not be responsible for the safe keeping of any of the securities evidencing the investment of Client, it being agreed and understood that the securities will be in the custody of Brokerage Firm pursuant to the Agreement attached hereto.

10.    Client agrees to imdemnify and hold harmless NQA from any claim it may have, now or in the future, against KEYSoft or KOS.

11.    This advisory agreement may not be assigned without client's express written consent.

2

<u>TIC  Holdings and Subsidiaries</u>

IN WITNESS WHEREOF, the parties hereto have set their hand and seal the day and year first written above.

NQA:
NORTHWEST QUADRANT ADVISORY GROUP, LLC

████████

By Its _Managing Director_

_Tim Smith_
Printed Name

██████████

TIC Holdings and Subsidiaries:

██████████

Signature(s)

_James F. Kissane_
Printed Name

████████

██████████

Address

████

Social Security or Tax ID Number

Initial Amount of Funds Deposited

3

TIC Holdings and Subsidiaries

ADDENDUM A – FEE SCHEDULE

# NORTHWEST QUADRANT ADVISORY GROUP, LLC
## Option Plan
### Investment Agent Fee Schedules*

I.  **Trust Asset Custodian Fee Schedule(Annualized Rates):**
    A.  Assets< $500,000 ................................................................................. .5% of Assets
    B.  Assets > $500,000 and < $1,000,000................................................. .5% of Assets
    C.  Assets > $1,000,000 and < $2,500,000.............................................. .5% of Assets
    D.  Assets > $2,500,000 and < $5,000,000.............................................. .40% of Assets
    E.  Assets > $5,000,000 and < $10,000,000............................................ .25% of Assets
    F.  Assets > $10,000,000........................................................................ .20% of Assets

*Fees billed quarterly*

II.  **Cashless Exercise Fee Schedule:**
    A.  Exercise Loans (if necessary) ...................................................... $100 transaction fee
                                                                                    Plus one day interest
                                                                                    At prime

Agreed this _____ day of _____ 2003

_____          _____
TIC Holdings and Subsidiaries              Northwest Quadrant Advisory Group, LLC
By:                                        By:

*(Fees will be blended to incorporate all Option Plan assets for TIC Holdings and Subsidiaries
and it's affiliated entities.)

4

# ASSET ALLOCATION SERVICES

## REPRESENTATIVE MANAGEMENT ACCOUNT AGREEMENT

1.   PARTIES:  This Agreement is made this 31st day of May, 2002 between Elizabeth F Hamilton ("Client"), Timothy J. Roth of Roth Capital (the "Representative") and Northwest Quadrant Advisory Group, LLC ("NWQ") whose principal office is located 2001 Route 46, Suite 506, Parsippany, NJ 07054.

2. APPOINTMENT: Client agrees to retain NWQ to provide Client with the investment advisory services for the compensation specified in this Agreement.  Both Client and NWQ intend to be legally bound by this agreement.

3.   SERVICES:  The Representative shall oversee one or more accounts for the Client under this Agreement.  Client wishes to have the Representative recommend an appropriate asset allocation and recommend specific stocks, bonds, no-load mutual funds and/or variable annuity/life sub-accounts.

NWQ shall have the discretion to select and replace securities and to select and adjust asset allocations as it deems appropriate to achieve optimal performance.

In the event the Representative from NWQ should for any reason no longer be employed by or properly licensed with NWQ, or should retire or otherwise resign from this Agreement, NWQ shall in writing inform the client of this event and appoint a new Representative of its choosing.  The Client shall then have thirty (30) days to indicate his or her desire to have a different Representative chosen, or to cancel this Agreement.  If no response is made within 30 days, this Agreement shall continue in full force and effect with the new Representative.

In the event that a conversion is missed due to a clerical error with material losses resulting therefrom, the Client's subscription for those dollars affected will be extended for up to one year without charge but NWQ assumes no responsibility for losses resulting therefrom.   Client should carefully review the prospectus of mutual funds held for any fund restrictions on exchanges as NWQ will not be responsible for losses resulting from any such restriction.  All newly received client monies will be placed in a money market account until such time as NWQ can implement computer and other procedural inputs.  Delays can occur in this process, for which NWQ assumes no responsibility.

NWQ makes no promises, representations, warranties or guarantees that any of the services to be rendered hereunder will result in a profit to the Client.  Client understands that there is substantial risk of principal loss with mutual fund and stock or bond investing.  **Client further understands that no risk reduction, tactical asset allocation or "timing" services are offered hereunder, and that client's results will fluctuate fully with market forces.**  Client agrees to hold NWQ and its officers, directors, members, representatives and any affiliates harmless for any losses in Client accounts due to any decrease in net value of funds owned by Client.

4.   TERM:  The term of this Agreement is for an initial period of one year and will continue thereafter unless either party terminates the agreement on 30 days' written notice.

5.   TERMINATION:  Client may terminate this agreement by written notice given within five (5) days after the date of this Agreement and receive a full refund of all fees paid to NWQ.  This Agreement may also be terminated by either party for any reason upon 30 days' written notice to the other party.  In the event of termination after five business days, the first fifty percent (50%) of the annual fee is considered direct cost and is not refundable.  The remaining fifty percent (50%) is refundable on a monthly prorated basis.  Upon cancellation of this agreement, all funds will be exchanged into a money market position unless otherwise instructed in the written notification of cancellation.  Non-payment of fees does not serve as notification of cancellation.



EXHIBIT

D

ALL-STATE LEGAL®

13.   NOTICE:   Any and all notices, designations, consents, offers, acceptances, or any other communications provided for herein shall be given in writing and shall be deemed to have been duly given if:  (A) delivered personally; (B) transmitted by prepaid facsimile, telegram or telex, if confirmed within twenty-four (24) hours thereafter by a signed original; (C) sent by a nationally recognized express courier service, postage or delivery charges prepaid, or (D) sent by certified mail, return receipt requested.

14. NON-WAIVER: Failure of either party to object or to take other action with respect to any conduct of the other party that may be a breach of this Agreement shall not be deemed a waiver of any breach or of any future breach or wrongful conduct.

15: SEPARABILITY: If any provision of this Agreement or its application to any person or circumstance is found to be invalid or unenforceable, the remainder of the Agreement or the application of that provision or to other persons or circumstances shall not be affected and shall remain in full force and effect.

16.   GOVERNING LAW:   The validity, interpretation, and performance of this Agreement shall be governed by and construed under the laws of the State of New Jersey.

17. ENTIRE AGREEMENT: This Agreement contains the entire understanding of the parties.  Any oral understandings are incorporated and merged in this Agreement.  No representations were made or relied upon by either party except as set forth.  This Agreement may not be changed unless both Client and NWQ agree to the change in writing.

Accounts to be managed under this agreement:

TD Waterhouse Acct #███████, Arthur T Hamilton IRR LIV Trust UA 5/9/95, Elizabeth F Hamilton TR
TD Waterhouse Acct #███████, Elizabeth F Hamilton REV LIV Trust UA 5/9/95, Elizabeth F Hamilton TR

ASSET ALLOCATION FEE:       0.75 %

*E. F. H.*  Client Initials

Northwest Quadrant Advisory Group, LLC
Timothy L. Smith, Managing Director

Client
Elizabeth F Hamilton

Representative
Timothy J Roth of Roth Capital

May 31, 2002

n:\winword\contract\NWQ\RMA

# NORTHWEST QUADRANT ADVISORY GROUP
## NEW CLIENT INFORMATION FORM

ID # _____ (FOR OFFICE USE ONLY)

Account #: ▮▮▮▮▮          Account Name: Arthur T Hamilton IRR LIV TRST UA 5 /9/ 95

First Name 1: Elizabeth    Last Name 1: Hamilton

First Name 2: N/A          Last Name 2: N/A

Salutation1: None

Salutation2: (Dear:)

Street Address: ▮▮▮▮▮▮▮▮▮▮

City/Town: ▮▮▮▮▮▮             State: IL            Zip: 61821

Home Phone: ▮▮▮▮▮▮        Fax #:  N/A            Fax 2:  N/A

Work Phone1: N/A     Work Phone2: N/A

SS1# ▮▮▮▮▮▮                        SS2# N/A

Income: ▮▮▮▮▮▮                    Net Worth: ▮▮▮▮▮▮

Employer1:  retired teacher          Employer 2: N/A

Date of Birth1: ▮▮▮▮▮            Date of Birth2: N/A

Child 1 ▮▮▮▮        Child2: ▮▮▮▮▮▮        Child3: ▮▮▮▮▮

Child4  N/A                  Child5:  N/A                      Review Month:

Remarks: None

Objective?    ✓Growth    ✓Income    ✓Tax Advantaged    —Speculation    — Other

Known Personally to Rep?  Yes    If yes, # of years  / ᵒ    Solicited?  No    Referred  Yes

Related to AssocPerson?  No    AssocPerson Name N/A    AssocPerson Relationship N/A

1 or 2:Employer Brokerage?  No   1 or 2:Employer Insurance Co.?  No  1 or 2:Employer Bank?  No

1: U.S. Citizen?  Yes    2: U.S. Citizen?  N/A    Officer/Director/>5% Shareholder in Public Co.?  No

Name of Company: Northwest Quadrant Advisors

Rep Signature: ▮▮▮▮▮▮▮▮▮▮▮        Date: 11-11-ᵒ²

Principal: ▮▮▮▮▮▮▮▮▮▮           Date: 1/31/03

CAM/NewCIInf

## NORTHWEST QUADRANT ADVISORY GROUP
### NEW CLIENT INFORMATION FORM

ID #_____ (FOR OFFICE USE ONLY)

Account #: ███████     Account Name: Elizabeth F Hamilton REV LIV TRUST UA 5/9/95

First Name 1: Elizabeth    Last Name 1: Hamilton

First Name 2: N/A          Last Name 2: N/A

Salutation1: None

Salutation2: (Dear:)

Street Address: ██████████████

City/Town: ██████████         State: IL          Zip: 61821

Home Phone: ████████     Fax #: N/A              Fax 2: N/A

Work Phone1: N/A    Work Phone2: N/A

SS1# ██████████                    SS2# N/A

Income: ██████████              Net Worth: ██████████

Employer1: retired teacher      Employer 2: N/A

Date of Birth1: ████████        Date of Birth2: N/A

Child 1 █████     Child2: ███████      Child3: ███████

Child4 N/A        Child5: N/A                        Review Month:

Remarks: None

Objective?    ─Growth    ✓Income    ─Tax Advantaged    ─Speculation    ── Other

Known Personally to Rep? Yes  If yes, # of years  /0    Solicited? No    Referred  Yes

Related to AssocPerson? No    AssocPerson Name N/A    AssocPerson Relationship N/A

1 or 2:Employer Brokerage? No  1 or 2:Employer Insurance Co.? No  1 or 2:Employer Bank? No

1: U.S. Citizen? Yes   2: U.S. Citizen? N/A   Officer/Director/>5% Shareholder in Public Co.? No

Name of Company: Northwest Quadrant Advisors

Rep Signature: ████████████████         Date: 11-11-02

Principal: ██████████████████           Date: 1/31/03

CAM/NewClInf